# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-464V

THOMAS L. ALLEY,

                    Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                    Respondent.

Chief Special Master Corcoran

Filed: October 14, 2025

*Rhonda Lorenz-Pignato, Shannon Law Group, PC, Woodridge, IL, for Petitioner.*

*Eleanor Hanson, U.S. Department of Justice, Washington, DC, for Respondent.*

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On January 11, 2021, Thomas Alley filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on August 11, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

Petitioner has provided preponderant evidence that he suffered the residual effects or complications of his injury for more than six months after vaccination. Petitioner has

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

also established all other requirements for a Table SIRVA, including a reduced range of motion ("ROM") and onset of pain within 48 hours. I therefore **grant** Petitioner's motion for a ruling on the record. Further, I award damages for actual pain and suffering in the amount of $35,000.00.

## I.    Procedural History

Petitioner filed this action approximately five months after receiving the flu vaccine alleged to have caused his injury. He was therefore incapable, at the outset, of establishing that he had suffered six months of sequelae. Petitioner then filed additional medical records, declarations, and a Statement of Completion. This case was activated to the SPU on May 19, 2022. ECF No. 18. Petitioner submitted a demand to Respondent but Respondent indicated in a status report that he was "not interested in considering" this demand. ECF No. 26.

On July 5, 2023, Respondent filed a Rule 4(c) Report asserting that the case was not appropriate for compensation. ECF No. 27 at 1. Respondent opposes this claim primarily on the basis that Petitioner had failed to satisfy the statutory severity requirement. *Id.* at 3. Respondent emphasizes that Petitioner initially complained of left shoulder pain to his primary care provider ("PCP") three weeks post-vaccination, but then declined a referral to an orthopedist and did not seek any further treatment for his left shoulder for a lengthy period of time. *Id.* at 3. Respondent also argues that Petitioner cannot establish all of the Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA claim because the medical records from before the treatment gap did not document any ROM deficits.

On August 24, 2023, I entered a scheduling order setting deadlines for briefing and for Petitioner to file any additional evidence. ECF No. 30. Petitioner filed a combined motion for ruling on the record as to both entitlement and damages on December 7, 2023. ECF No. 33 ("Pet'r Mot."). On February 22, 2024, Respondent filed an opposition to Petitioner's motion. ECF No. 35 ("Resp't Opp'n"). On March 4, 2024, Petitioner filed a reply in support of his motion. ECF No. 37 ("Pet'r Reply"). This matter is ripe for adjudication.

## II.   Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

### A.    Petitioner's Pre-Vaccination Medical Status

Petitioner was 66 years at the time of vaccination and was retired from a career in data processing. Ex. 3-II at 14; Ex. 1 at 1-3. He had no history of left shoulder pain or injury. In 2019, Petitioner was seen by his PCP at Bridges Medical Services for hypothyroidism (for which he was prescribed levothyroxine), allergies, skin cancer concerns, and chest tightness with a chronic cough. *See* Ex. 4 at 26-38. Petitioner also underwent outpatient cardiology testing related to his cough and shortness of breath. *See* Ex. 2-II at 298, 314-317.

Petitioner did not have any medical appointments between November 2019 and August 2020. On August 5, 2020, Petitioner had an annual wellness exam with Nurse Practitioner ("NP") Jean Christ at Bridges Medical Services. Ex. 4 at 22-25. At this appointment, he rated his current health as "very good," but also stated that he had "a lot of body pain in the last four weeks." *Id.* at 22. On August 10, 2020, Petitioner was seen for blood work. Ex. 2-II at 266.

### B.    Petitioner's Vaccination and Initial Treatment for Left Shoulder Pain

Petitioner received the flu vaccine in his left arm on August 11, 2020, at Walgreens Pharmacy. Ex. 3-II at 14-15. He also received a pneumonia vaccine in his right arm. *Id.* at 16-17. According to Petitioner, the woman who administered the vaccine had "limited space to stand" on his left side and "seemed cramped and awkward" when performing the injection. Ex. 1 at 1-2. Petitioner believed that the vaccination was administered too high on his arm. *Id.*

On August 21, 2020 (now ten days after vaccination), Petitioner had an appointment with NP Christ. Ex. 4 at 20. The record for this visit stated that Petitioner presented to the clinic to review the previous tests and his "chief complaint" was listed as "lab review." *Id.* However, it appears that Petitioner discussed at least some of his health concerns because NP Christ stated he had continued allergy symptoms and had requested a prescription refill for his allergy medicine. *Id.*

NP Christ performed a review of systems and documented Petitioner's vital signs at this appointment. Ex. 4 at 20. NP Christ apparently examined Petitioner's neck and noted a "free range of motion." *Id.* However, it is unclear if NP Christ specifically examined Petitioner's shoulders, because the standard chart used by Bridges Medical Services generally did not list the musculoskeletal system as part of the review of systems. *See id.* at 20, 26-38. There is no evidence that Petitioner mentioned any pain in his left shoulder.

Petitioner returned to NP Christ on September 2, 2020. At this appointment, he specifically complained of "pain in his upper left arm since receiving a flu shot in the same arm 3 weeks ago." Ex. 4 at 18. Petitioner denied having experienced redness or swelling, but reported "point tenderness at lateral left shoulder along with sharp pain when raising arm or intentionally rotating arm." *Id.* NP Christ diagnosed Petitioner with bicipital tendinitis and recommended treating with ice, rest, and NSAIDs. *Id.* at 19. She also provided Petitioner with shoulder exercises to do at home. Ex. 1 at 2. NP Christ indicated that she would consider a referral to orthopedics if the pain continued. *Id.*

On September 23, 2020, NP Christ wrote a referral for a left shoulder x-ray with a diagnosis of "shoulder and bicep pain." Ex. 2-II at 250. The next day, September 24, 2020, Petitioner went to Cox Medical Center to receive this x-ray.[3] Ex. 4 at 43. The results were unremarkable. *Id.*

On October 2, 2020, NP Christ wrote a referral to orthopedics for left lateral shoulder pain. Ex. 4-II at 71.[4] However, on October 8, 2020, Petitioner informed his PCP that he did not want to be seen or treated by orthopedics at that time and would just "grin and bear it." *Id.* Petitioner asserts in a declaration that he actually did decide to schedule an appointment with an orthopedist for October 27, 2020, but was unable to keep this appointment because he and his wife contracted COVID-19. Ex. 1 at 2-3. Nonetheless, Petitioner's medical records do not contain any reference to an October 27, 2020 appointment or its cancellation.

Petitioner went to the emergency room ("ER") on October 23, 2020, with sinus drainage, a productive cough, fatigue, and shortness of breath. Ex. 2-II at 209. He tested positive for COVID-19 and was counselled on treating his symptoms at home, how to isolate, and when to seek further medical attention. *Id.* at 178, 209-223. It does not appear that Petitioner discussed any left shoulder pain while receiving treatment at the ER.

Petitioner then went to his PCP's office on October 27, 2020, to request a chest x-ray because his COVID-19 symptoms had not improved. Ex. 4 at 16. He complained of a chronic cough, generalized malaise, low-grade fever, and decreased appetite. *Id.* Petitioner was examined in his car due to the risk of COVID-19 exposure and his treaters only documented assessments of his cardiovascular and respiratory systems. *Id.* at 16-

---

[3] Respondent states that Petitioner was seen at the emergency room for pain in his left shoulder and upper arm on September 24, 2020. *See* Resp't Opp'n at 3. Although Petitioner underwent the x-ray at the hospital, the records do not suggest that he sought treatment at the emergency room.

[4] Petitioner asserts that he requested this referral at some point after the September 2, 2020 appointment, but there is no record of any contact with NP Christ on this topic. *See* Ex. 1 at 1.

17. Petitioner proceeded to get a chest x-ray that same day. *Id.* at 41. There is no indication that Petitioner mentioned any issue with his left shoulder during these encounters.

On October 30, 2020, Petitioner returned to the ER with a cough and difficulty breathing and stated that he did not feel that he was getting better. Ex. 2 at 43. The ER physician performed a physical examination and documented a "[n]ormal ROM, normal strength." *Id.* at 47. As part of a neurological exam, the ER physician also noted that Petitioner "[m]oved all 4 extremities normally." *Id.* Petitioner was again discharged home with information about treating COVID-19. *Id.* at 49-50. As in his previous COVID-19-related encounters, it does not appear that Petitioner complained of left shoulder pain.

The next medical treatment that Petitioner received was on December 10, 2020 when he had lab work done for his hypothyroidism. Ex. 2-II at 134-147. The treating physician gave Petitioner a new prescription for levothyroxine. *Id.* at 140, 146. Petitioner then did not seek any further medical care for any purpose for another eight months. In the interim, Petitioner and his wife moved from Missouri to Georgia in January 2021. Ex. 1 at 3.

### C.    Petitioner Complains of Left Shoulder Pain to a New Treater

On June 28, 2021, after he had already filed this suit, Petitioner had an appointment with a new PCP, Dr. Glen Dasher, at Southern Family Medicine. Ex. 5 at 5. Petitioner complained of left shoulder pain and stated that the pain occurred "after [f]lu shot."[5] *Id.* Petitioner also stated that he had seen improvement from his home exercises and wanted to know "if there is any other options." *Id.*

On examination, Dr. Dasher noted that Petitioner had "decreased abduction [l]eft shoulder." *Id.* Dr. Dasher reviewed Petitioner's exercises and discussed physical therapy as an option if the pain persisted. However, Petitioner did not follow-up with any additional treatment for his left shoulder after this appointment. No further medical records were filed.

### D.    Declaration Evidence

Petitioner filed his first declaration, dated January 9, 2021, with his Petition.[6] Ex. 1 at 4. Petitioner stated therein that he felt immediate pain in his left shoulder at the time of

---

[5] Petitioner also discussed his hypothyroidism and allergies at this appointment. Ex. 5 at 5. Dr. Dasher provided Petitioner with refills of his levothyroxine and allergy medicine. *Id.* at 6.

[6] Petitioner's declarations were signed under penalty of perjury as required by 28 U.S.C. § 1746.

vaccination, and within 24 hours began to experience restrictions in his ROM. *Id.* at 2. Petitioner specifically described pain when he tried to move his arm up or down or when he rotated his arm. *Id.*

Petitioner also discussed what occurred during his gap in treatment. According to Petitioner, it took him approximately one month to recover from COVID-19. Ex. 1 at 3. Even before he became ill, Petitioner had limited leaving his home due to pandemic safety concerns and after he recovered, he remained isolated because he was concerned that he might catch the virus again. *Id.* Petitioner decided to "monitor the number of COVID-19 cases in [his] area and listen to the suggestions and restrictions set forth by the government and the medical community" for individuals in his age group. *Id.* Further, Petitioner described his move to Georgia. *Id.* at 3.

Petitioner asserted that he continued to suffer from pain in his left shoulder, even though it had improved by approximately 50 percent. Ex. 1 at 3. He rated his pain level as 1/10 at its best and 7/10 at its worst. *Id.* Petitioner further stated that he had pain daily and could no longer play golf, swim, ski, or type on his computer to perform contract programming work without pain. *Id.* at 4.

After Respondent filed the Rule 4(c) Report, Petitioner submitted a second declaration, dated October 10, 2023.[7] Ex. 8 at 4. In this declaration, Petitioner stated that he continued to have pain and restrictions to ROM after January 2021 and thus his symptoms had continued for over six months post-vaccination. *Id.* at 2. Petitioner also stated that his pain was still ongoing and described impacts on his daily life similar to his first declaration. *Id.* at 3.

To counter Respondent's suggestion that he did not meet the severity requirement, Petitioner elaborated upon his reasons for not seeking treatment for his shoulder between September 2020 and June 2021. According to Petitioner, in addition to being concerned about contracting COVID-19 again, he bought a new home in Georgia on December 18, 2020 and was very busy until approximately February 2021 with preparations for moving and setting up his new home. *Id.* at 3. After that, Petitioner and his wife "spent a lot of time getting acclimated to living in a new home, and in a new state" and had to spend the time to find a new PCP. *Id.* Petitioner also hoped that his pain would continue to improve doing the home exercises. *Id.* Petitioner described his attitude of generally not being the "type of person to get a lot of medical care, especially for issues related to pain in [his] muscles." *Id.* Petitioner preferred to try to manage chronic pain on his own. *Id.*

---

[7] Petitioner's wife, Rebecca Alley, also submitted a declaration, dated October 11, 2021. Ex. 7 at 3. This declaration generally repeats information from Petitioner's first and second declarations. Mrs. Alley reported observing for 14 months that her husband could not fully use his left arm and could not participate in the same activities as before the vaccination. *Id.* at 1-3.

Petitioner filed a third declaration on March 3, 2024, at the same time he filed his reply in support of his motion for a ruling on the record. Ex. 9 at 1. This declaration responded to certain arguments made by Respondent in the briefing. Petitioner asserted that his treatment in October 2020 was focused on his COVID-19 symptoms and he was never examined for other issues. *Id.* Further, Petitioner averred that on August 21, 2020, he had an office visit with his PCP, but the purpose of this appointment was to review lab work and he did not receive a full examination. *Id.* at 3. Petitioner stated that he did not mention his left shoulder symptoms because he believed at this time that it would get better on its own. *Id.*

## III.    Ruling on Entitlement

### A.    Legal Standards

To receive compensation under the Vaccine Program, a petitioner must prove either (1) that he suffered an injury falling within the Vaccine Injury Table, or (2) that he suffered an injury that was actually caused by his vaccine. *See* Sections 13(a)(1)(A) and 11(c)(1). Under either method, however, a petitioner must demonstrate that the injured person has "suffered the residual effects or complications of his illness, disability, injury, or condition for more than six months after the administration of the vaccine."[8] Section 11(c)(1)(D)(i). Cases may appropriately be dismissed for failure to substantiate the severity requirement. *See, e.g., Hinnefeld v. Sec'y of Health & Hum. Servs.*, No. 11-328V, 2012 WL 1608839, at *4–5 (Fed. Cl. Spec. Mstr. Mar. 30, 2012) (dismissing case where medical history revealed that petitioner's Guillain-Barré Syndrome resolved less than two months after onset).

The petitioner carries the burden of establishing the matters required in the petition, including the severity requirement, by a preponderance of the evidence. Section 13(a)(1)(A); *see Song v. Sec'y of Health & Hum. Servs.*, 31 Fed. Cl. 61, 65-66 (1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 2014). Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373, cited in *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied,* 132 S.Ct. 1908 (2012); *Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

---

[8] Petitioner does not allege, nor would the evidence support, either alternative for establishing the severity requirement: that the alleged injury resulted in death, or "inpatient hospitalization and surgical intervention." Section 11(c)(1)(D)(ii), (iii).

The Vaccine Act prohibits finding that a petitioner has met this burden "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a). Medical records must be considered, *see* Section 13(b)(1), and are generally afforded substantial weight. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). The factual matters required to prove elements of a Vaccine Act claim may be established by a *mix* of witness statements and record proof, with the special master required to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 (2013) (citing Section 12(d)(3); Vaccine R. 8), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

## B.  Petitioner Has Established Severity by a Preponderance of the Evidence

In order to meet the statutory six-month severity requirement, Petitioner must demonstrate, by a preponderance of the evidence, that he suffered the "residual effects or complications" of his claimed injury beyond February 11, 2021. *See* Section 11(c)(1)(D)(i). Respondent's challenge to severity is based on Petitioner's lack of treatment for his left shoulder between September 2, 2020 and June 28, 2021. Rule 4(c) Report at 3; Resp't Opp'n at 7-8. Respondent emphasizes that Petitioner received "virtually no treatment" for his alleged injury. Resp't Opp'n at 9-10.

It is well-established that a treatment gap does not automatically preclude a petitioner from proving severity. *See Law v. Sec'y of Health & Hum. Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Mar. 27, 2023). And Respondent's argument ignores that at the June 28, 2021 appointment, Dr. Dasher recorded that Petitioner was still experiencing left shoulder pain and decreased abduction. Ex. 5 at 5-6. Dr. Dasher's notes linked the reported shoulder complaints back to the August 11, 2020 flu vaccine – and this kind of "bridging" evidence can help establish severity (depending on the length of the gap in question). *See Mejias v. Sec'y of Health & Hum. Servs.*, No. 19-1944V, 2021 WL 5895622, at *4 (Fed. Cl. Spec. Mstr. Nov. 10, 2021). Although Respondent points out that this visit occurred after Petitioner had filed suit, *see* Resp't

Opp'n at 9 n. 6, I see no reason to afford it less than the typical substantial weight. There is no evidence that Petitioner exaggerated his condition – to the contrary, he acknowledged to Dr. Dasher that his symptoms had improved with home exercises and merely sought information about possible further treatment options. *See* Ex. 5. at 5. Petitioner's complaint to Dr. Dasher preponderantly demonstrates that his pain had continued for more than six months post-vaccination.

Although Respondent is correct that Petitioner received no specialist care, PT, or prescription medication for his left shoulder pain, the Vaccine Act does not require a petitioner to obtain treatment for his injury for the six month period. I have previously held that a claimant satisfied the statutory threshold when he resumed treatment and provided a reasonable explanation for the gap. *Rodionov v. Sec'y of Health & Hum. Servs.*, No. 20-0842V, 2023 WL 8112948, at *5 (Fed. Cl. Spec. Mstr. Oct. 18, 2023). Here, Petitioner's failure to seek formal treatment for his shoulder is reasonably explained by his bout with COVID-19, his concerns about limiting interactions outside the home during the pandemic, and his personal circumstances purchasing a new house and moving to Georgia. Petitioner's treatment gap is highly relevant to damages, as discussed below, but I do not treat it as proof that Petitioner's symptoms did not last the required six months.

Respondent attempts to argue that Petitioner had recovered after two months by asserting that Petitioner's COVID-19-related encounters did not document any left shoulder issues. Resp't Opp'n at 3-4, 8. In particular, Respondent emphasizes that Petitioner's apparently normal examination at the ER on October 30, 2020, provides "objective medical evidence" that his left shoulder symptoms had resolved by that point. *See* Resp't Opp'n at 8. However, Respondent's theory is refuted in the first instance by his discussion of his left shoulder pain as a current issue with Dr. Dasher in June 2021. *See* Ex. 5 at 5-6. On October 8, 2020, Petitioner also informed his PCP of his intent to "grin and bear" his left shoulder symptoms, which does not suggest that he was actually pain-free. Ex. 4-II at 71.

Further, the content of the October 23, October 27, and October 30, 2020 records (along with Petitioner's personal recollections) confirms that Petitioner's treatment was solely focused on his COVID-19 symptoms. *See* Pet'r Reply at 4-5; Ex. 9 at 1-2. I do not find that the lack of documentation of any left shoulder pain during these unrelated encounters, or Petitioner's failure to bring it to the attention of his treaters, demonstrates a resolution of this issue. The context of an unprecedented pandemic is also important – for example, Petitioner was examined in his car at one visit and thus could not have received a full physical assessment. Although I do not find it necessary to declare the October 30, 2020 ER record to be "incorrect and unreliable," *see* Pet'r Reply at 4, I agree that in these circumstances, the notation of a normal musculoskeletal or neurological

examination does not outweigh the evidence from the June 2021 appointment and Petitioner's declarations that his pain was ongoing.

Respondent's remaining arguments on severity are aimed at discrediting Petitioner's declarations. Resp't Opp'n at 10-12. But Respondent's points are not convincing. Respondent homes in on Petitioner's assertion that he had an appointment with an orthopedist at the end of October that he then had to cancel due to COVID-19, which does not appear in the medical records. *See id.* at 11; Ex. 1 at 2-3. However, a lack of corroboration is not an inconsistency *per se.* Further, the existence of this appointment is not probative to whether Petitioner's symptoms lasted for more than six months.

Similarly, Respondent also asserts that Petitioner's declarations are inconsistent with the medical records because at his annual wellness visits, he stated that he did not exercise and had not done so in the last four weeks, but now currently claims that he can no longer golf, ski or swim due to his left shoulder injury. *See* Resp't Opp'n at 12. Again, Petitioner's propensity to exercise is irrelevant to severity. This argument gives far too much import to Petitioner's responses to standardized questionnaires.[9]

These supposed inconsistencies plucked from the medical record by Respondent do not demonstrate that Petitioner's declarations are unreliable. There is also no basis for Respondent's suggestion that Petitioner's declarations automatically must be afforded little weight just because they were filed after the initiation of litigation. *See* Resp't Opp'n at 10. Petitioner does not present a "contradictory version of the facts" in his declarations. *See id.* at 12. I do not make any findings based on Petitioner's testimony alone, but Petitioner's declarations provide a straightforward account of his personal experiences and add context to otherwise cursory medical records.

This is a case in which Petitioner, by his own choice, received minimal medical care for his left shoulder. Nonetheless, his initial treatment records and Dr. Dasher's notes from June 28, 2021, in conjunction with his declarations, fulfill his burden of proof on severity. I find that Petitioner suffered from the residual effects and complications of his injury for more than six months post-vaccination.

---

[9] Respondent also appears to have misread Petitioner's declaration as stating that he did not seek any medical care after August 11, 2020 due to the COVID-19 pandemic. *See* Resp't Opp'n at 11-2; Pet'r Reply at 10. Respondent's effort to prove that Petitioner did receive medical care when necessary is misplaced.

**C.    Petitioner Has Established That He Had Reduced ROM by a Preponderance of the Evidence**

The third SIRVA QAI requires that a petitioner's pain and reduced ROM be limited to the shoulder in which the vaccine was administered. *See* 42 C.F.R. § 100.3(c)(10)(iii). Respondent's only challenge to this element of a SIRVA is that Petitioner was not recorded as having ROM deficits at any of his appointments in August/September 2020, including when he first reported left shoulder pain on September 2, 2020. *See* Rule 4(c) Report at 4; Resp't Opp'n at 5 n. 5. However, Respondent acknowledges that Dr. Dasher did document decreased abduction in Petitioner's left shoulder on June 28, 2021. *See id.*

I have previously held that the third QAI "requires that a [p]etitioner demonstrate they suffered *both* pain and limited or reduced range of motion following receipt of a covered vaccine." *Bolick v. Sec'y of Health & Hum. Servs.*, No. 20-893V, 2023 WL 8187307, at *8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023) (emphasis added). However, and contrary to Respondent's suggestion that Petitioner's claim fails because he did not *immediately* exhibit a reduced range of motion, the third QAI does not contain any timing requirement. *See id.* at *7. Further, the separate onset QAI "makes no reference to range of motion occurring within a specified time-frame" and has been interpreted to require only proof of pain, not reduced ROM, in the 48-hour period post-vaccination. *See id.* (citing *Robuck v. Sec'y of Health & Hum. Servs.*, No. 20-0465V, 2023 WL 6214986, at *6 (Fed. Cl. Spec. Mstr. Aug. 21, 2023)). Indeed, several decisions both before and after *Bolick* have rejected identical arguments on the part of Respondent. *See Robuck*, 2023 WL 6214986, at *6; *Washburn v. Sec'y of Health & Hum. Servs.*, No. 21-481V, 2024 WL 886621, at *4 (Fed. Cl. Spec. Mstr. Jan. 25, 2024); *Schwalm v. Sec'y of Health & Hum. Servs.*, No. 21-0066V, 2024 WL 1740482, at *2 (Fed. Cl. Spec. Mstr. Mar. 21, 2024).

Petitioner is therefore not precluded from proving entitlement simply because a reduced ROM was not documented until June 28, 2021.[10] Respondent does not appear to dispute that Dr. Dasher's finding of decreased abduction constitutes a reduced ROM. *See* Rule 4(c) Report at 4. Petitioner has thus satisfied this QAI element by a preponderance of the evidence.[11]

---

[10] Petitioner also argues that he demonstrated a limited ROM when he complained on September 2, 2020 of a "sharp pain" when raising or internally rotating his arm. *See* Pet'r Mot. at 12. However, *Bolick* explains that painful arm movement, even when the pain may deter the petitioner from taking certain actions, is not equivalent to a limitation on movement entirely. *Bolick v. Sec'y of Health & Hum. Servs.*, No. 20-893V, 2023 WL 8187307at *9 (Fed. Cl. Spec. Mstr. Oct. 19, 2023). For this reason, I only rely on Dr. Dasher's June 28, 2021 notes to find that Petitioner has met this QAI element.

[11] Respondent's Rule 4(c) Report only challenges severity and limited ROM. *See* Rule 4(c) Report at 3-4. However, in Respondent's opposition to Petitioner's motion for a ruling on the record, Respondent instead raises onset and only discusses limited ROM in a footnote. *See* Resp't Opp'n at 5-6. Respondent asserts that Petitioner's 21-day delay in complaining of left shoulder pain and his intervening appointment on August

Respondent does not raise any other objections to entitlement. *See generally id.* Based on my independent review, I find that Petitioner has preponderantly established all requirements for a Table SIRVA claim. 42 C.F.R. § 100.3(c)(10). Accordingly, he need not prove causation-in-fact. Section 11(c)(1)(C). I also find that Petitioner has satisfied all other statutory requirements. Section 11(c)(A), (B), and (D).

## III.    Damages

### A.    Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[12]

### B.    Appropriate Compensation for Pain and Suffering

In his motion, Petitioner requests a pain and suffering award of $45,000.00 for an "initially moderate" SIRVA that "became milder, overall." *See* Pet'r Mot. at 17-21. Although

---

21, 2020 to discuss lab results, during which he had at least a limited physical examination that documented "free range of motion" in his neck, weigh against entitlement. *See id.*; Ex. 4 at 20.  However, I give greater weight to Petitioner's report on September 2, 2020 that he had experienced left shoulder pain "since receiving a flu shot in the same arm 3 weeks ago." Ex. 4 at 18. As I have stated in many cases, it is not uncommon for SIRVA petitioners to delay treatment thinking that the injury will resolve on its own. Petitioner's delay here was relatively short and he explained in his declaration that he did not mention his shoulder symptoms on August 21, 2020 because he "still thought that [he] was just experiencing a more severe form of the normal post-vaccination pain . . . ." Ex. 9 at 3. Considering the totality of the evidence, Petitioner likely suffered left shoulder pain within 48 hours of vaccination.

[12] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Petitioner presented several pages of analysis and a comparator case, Respondent chose not to provide any refutation or alternative figure. Instead, Respondent states his position in a footnote that it is "premature to discuss damages as the issue of entitlement has not been resolved." Resp't Opp'n at 2 n.2. But there is no reason not to rule on damages at this time. Respondent has had ample opportunity to respond to Petitioner's arguments, and the total sum at issue is relatively modest.

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In support of his proposed award, Petitioner cites *Mejias*, which also involved an award of $45,000.00 for pain and suffering. Petitioner highlights that the *Mejias* petitioner saw his PCP "fairly quickly" after vaccination to report shoulder pain, but only received conservative treatment of home exercises and medication. Pet'r Mot. at 20-21 (citing 2021 WL 5895622, at *4). Similarly, after initial appointments, the *Mejias* petitioner also had an eight-month treatment gap and did not seek any additional treatment beyond that final follow-up. *See id.* Further, as in *Mejias*, Petitioner has medical records documenting an injury lasting approximately ten and a half months, including the gap, although he states in his declarations that his pain has been ongoing for several years now. *See id.*

*Mejias* is indeed similar to the instant case in terms of duration. However, *Mejias* involved a more severe SIRVA. The *Mejias* petitioner went to a walk-in clinic just two days after vaccination and reported that he was unable to lift his arm. *Mejias*, 2021 WL 5895622, at *3. The *Mejias* petitioner was given a prescription for a lidocaine patch and a muscle relaxer and was referred to an orthopedic surgeon. *Id.* He then saw the orthopedist only ten days after vaccination and was found to have positive impingement signs. *Id.* The orthopedist also discussed a steroid injection, although the *Mejias* petitioner was apprehensive about receiving more injections. *Id.* Eight months later, the *Mejias* petitioner saw a different orthopedist and still had positive impingement signs. *Id.* He underwent an MRI, which was abnormal. At the *Mejias* petitioner's final appointment, the orthopedist recommended PT, but he did not follow-up. *Id.*

By contrast, Petitioner here received no treatment beyond two primary care appointments, an x-ray, non-prescription pain medication, and home exercises. Notably, Petitioner declined his PCP's referral to an orthopedist and did not receive an MRI. *See* Ex. 4-II at 71. Petitioner also stated in his declaration that he did not want to go to PT. Ex. 8 at 4. Further, Petitioner has admitted that his pain improved over time through performing his home exercises. Ex. 1 at 3; Ex. 8 at 3.

14

Although I credit Petitioner's and his wife's statements that his left shoulder pain has impacted his sleep, recreational activities, and also made his relocation to Georgia more difficult, the overall impression from the record is that Petitioner's pain has been a low-level irritation in his life, not a severe problem. *See* Ex. Ex. 1 at 3; Ex. 7 at 2; Ex. 8 at 1-4. Petitioner considered his pain a chronic condition that he was capable of managing on his own. *See* Ex. 8 at 4. Therefore, this set of facts does not present the "initially fairly severe" SIRVA seen in *Mejias*. *See* 2021 WL 5895622, at *7.

In light of the difference in severity from *Mejias* and Petitioner's decision to forego formal treatment, I find that an award of $35,000.00 for pain and suffering is appropriate.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $35,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[13]

**Therefore, I award Petitioner the following:**

- **$35,000.00 for pain and suffering to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.**

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.